IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **PAMELA SUE LAY,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No.  3:15-CV-3528-M-BH** |
| | § | |
| **NANCY BERRYHILL, ACTING,** | § | |
| **COMMISSIONER OF THE SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| | § | |
| **Defendant.** | § | **Referred to U.S. Magistrate Judge** |

## FINDINGS, CONCLUSIONS, AND RECOMMENDATION

Pursuant to *Special Order No. 3-251*, this social security appeal was automatically referred for full case management. Before the Court are *Plaintiff's Brief - Social Security*, filed March 1, 2016 (doc. 13), *Commissioner's Brief*, filed March 31, 2016 (doc. 14), and *Plaintiff's Reply Brief - Social Security*, filed April 20, 2016 (doc. 15).  Based on the relevant filings, evidence, and applicable law,  the Commissioner's decision should be **AFFIRMED**.

## I. BACKGROUND[1]

### A.    Procedural History

Pamela Sue Lay (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner)[2] denying her claim for disability insurance benefits (DIB) under Title II of the Social Security Act (Act).  (R. at 1,13.)  On May 25, 2012, Plaintiff filed her application for disability benefits under Title II of the Act, alleging disability beginning on July 1,

---

[1]   The background information is summarized from the record of the administrative proceeding, which is designated as "R."

[2]   At the time of the initial filing of this appeal, Carolyn W. Colvin was the Acting Commissioner of the Social Security Administration, but she was succeeded by Nancy A. Berryhill beginning January 20, 2017.

2009. (R. at 13.)  Her claim was denied initially and upon reconsideration. (R. at 13.)  Plaintiff requested a hearing before an Administrative Law Judge (ALJ), and personally appeared and testified at a hearing on March 12, 2014. (R. at 13-26.) On July 22, 2014, the ALJ issued a decision finding that Plaintiff was not disabled and denying her claim for benefits. (R. at 10-26.)

Plaintiff timely appealed the ALJ's decision to the Appeals Council. (R. at 1.) The Appeals Council denied her request for review on September 9, 2015, making the ALJ's decision the final decision of the Commissioner.  (R. at 1-5.)  Plaintiff timely appealed the Commissioner's decision under 42 U.S.C. § 405(g). (*See* doc. 1.)

**B.** **Factual History**

**1.** **Age, Education, and Work Experience**

Plaintiff was born on January 7, 1957, and was 57 years old at the time of the hearing before the ALJ. (R. at 36.)  She had earned a GED and completed one year of college courses.  (R. at 36-37.) She had past relevant work as a receptionist and a call center customer representative.  (R. at 61-62.)

**2.** **Medical Evidence**

Prior to Plaintiff's alleged onset date of disability, she had endoscopic carpal tunnel release surgery at the Fort Worth Surgery Center on her left hand on June 30, 2006, and on her right hand on July 14, 2006.  (R. at 336-78.)  Both surgeries were successful.  (R. at 343-44.)

On November 27, 2007, Plaintiff met with her primary care physician, Dr. Yvonne Billue[3], M.D., for refills on medications for her previously diagnosed hypothyroidism.  (R. at 276.)  Dr. Billue noted that Plaintiff might need blood work but was otherwise normal.  (R. at 276.)

---

[3]  Dr. Billue is identified at different points in the record as Dr. Billue, Dr. Reeve, and Dr. Reed.  (R. at 52, 379-406.)

On January 27, 2009, Plaintiff met with Dr. Billue for sinus congestion.  (R. at 269.)  Dr. Billue prescribed medication for the congestion as well as medication for her previously diagnosed high cholesterol.  (R. at 269.)

On July 22, 2010, Plaintiff met with Dr. Billue for stomach pain and problems.  (R. at 266.) Dr. Billue diagnosed her with gastritis and ordered radiology testing on her liver and gall bladder. (R. at 266.)  Plaintiff received a right upper quadrant sonogram radiology exam later that day.  (R. at 265.)  She had a follow-up with Dr. Billue on July 27, 2010, to discuss evidence of fatty infiltration of her liver. (R. at 260.)

On July 28, 2010, Plaintiff received a radiology exam at the Huguley Memorial Medical Center for joint pain in her hands and feet. (R. at 258-59.)  The exam showed no significant arthritic abnormalities affecting either hand and no signs of an inflammatory arthritis affecting either foot. (R. at 258-59.)  There was evidence, however, of bilateral calcaneal spurs in her feet.  (R. at 259.)

On September 28, 2010, Plaintiff met with Dr. Billue for sneezing and congestion.  (R. at 256.)  Dr. Billue diagnosed her with sinusitis and prescribed medication.  (R. at 256.)

On November 19, 2010, Plaintiff met with Dr. Billue for pain in her arms, joints, and muscles. (R. at 255.)  Dr. Billue diagnosed her with myalgia and prescribed medication.  (R. at 255.)

On June 21, 2011, Plaintiff met with Dr. Billue for complications due to her hypothyroidism. (R. at 251.)  Dr. Billue recommended that she take fish oil and flaxseed oil supplements and noted signs of fibromyalgia syndrome.  (R. at 251.)

On July 26, 2011, Plaintiff had a follow-up visit with Dr. Billue during which she also made new complaints of pain in her feet and shoulders.  (R. at 248.)  Dr. Billue prescribed medication and diagnosed her with fibromyalgia syndrome and obesity.  (R. at 248.)

3

On February 23, 2012, Plaintiff met with Dr. Sonia Bajaj, M.D., for treatment of her previously diagnosed rheumatoid arthritis. (R. at 205-10.) Plaintiff stated that she was "doing fairly well" and found the prescribed Neurontin helpful for her muscle and neck pain. (R. at 205.) Dr. Bajaj noted that Plaintiff was "in no distress, sitting" but would need labs every two to three month to monitor disease activity. (R. at 205.)

On March 5, 2012, Plaintiff met with Dr. Billue because she had complaints of pain in her legs and feet. (R. at 238.) Dr. Billue referred her to Dr. Randy Lew, DPM, PA, for pain management. (R. at 238.)

On March 14, 2012, Plaintiff was evaluated by Dr. Lew for complaints of pain in her feet and heels. (R. at 211.) Dr. Lew noted a calcaneal bone spur at her Achilles insertion. (R. at 211.) He instructed her to have an MRI to determine if there was any possible tear of the Achilles tendon. (R. at 211-12.) The MRI results showed that there was no evidence of a "full-thickness tear" or any marrow contusion, stress fracture, or aggressive osseous lesion, but there was evidence of mild interstitial tearing of the distal tendon fibers. (R. at 215.)

On May 21, 2012, Plaintiff met with Dr. Billue for complaints of hair loss and being very tired. (R. at 237.) Dr. Billue opined that these were symptoms of her hypothyroidism and ordered further tests. (R. at 237.) The test results did not show any previously undiagnosed medical problems. (R. at 235-36.)

On May 30, 2012, Plaintiff met with Dr. Billue for sores in her mouth. (R. at 234.) Dr. Billue diagnosed her with mouth ulcers and prescribed medication. (R. at 234.)

On June 11, 2012, Plaintiff was examined by Dr. Billue for right shoulder pain sustained during a scorpion encounter when she was in Mexico. (R. at 230.) Dr. Billue administered an MRI

and opined that there was no rotator cuff tear, but there was evidence of calcified bodies suggesting Sjogren's syndrome, which often accompanies rheumatoid arthritis.  (R. at 231-32.)  Dr. Billue prescribed pain medication.  (R. at 232.)

On June 5, 2012, Plaintiff received treatment from Dr. Nathan Berry, M.D., of the Berry Eye Center for blurry vision in both eyes.  (R. at 330.)  Dr. Berry noted that she reported that her blurry vision "affect[ed] [her] ability to read small print and watch television."  (R. at 330.)  He provided her with gel eye drops and discussed early signs of cataract formation and potential effects on her vision.  (R. at 334.)

On September 26, 2012, Plaintiff had a follow-up with Dr. Berry for a new pair of prescription eye glasses.  (R. at 221.)  He noted that she showed signs of bilateral nuclear cataracts and dry eye syndrome and might need cataract surgery in the future.  (R. at 225-226.)

On July 11, 2012, Dr. Billue completed a medical opinion questionnaire regarding Plaintiff's mental impairments.  (R. at 282.)  She diagnosed Plaintiff with depression and gave her a poor prognosis.  (R. at 282.)  On the check-box questionnaire, she opined that Plaintiff had no useful ability to function in thirteen of twenty-five categories for "mental abilities needed to do any job," including little to no mental aptitude to remember work-like procedures, carry out very short and simple instructions, deal with co-workers, respond appropriately to changes in a routine work setting, deal with normal work stress, and maintain attention for a two hour segment.  (R. at 282-83.) She further opined that Plaintiff had a "good" mental aptitude for four of the twenty-five categories, including the ability to adhere to basic standards of cleanliness, sustain an ordinary work routine, ask simple questions or request assistance, and be aware of normal hazards and take appropriate precautions.  (R. at 282-83.)  Dr. Billue noted that Plaintiff would be absent from work more than

twice a month on average due to her impairments.  (R. at 284.)

On August 20, 2012, Plaintiff met with Dr. Lawrence Sloan, Ph. D., for a mental status exam. (R. at 288-91.)  He noted that she drove herself to the appointment, and was unaccompanied, well-dressed and groomed, and calm and cooperative.  (R. at 288.)  She reported problems with depression, anxiety, concentration, and memory.  (R. at 288.)  She had only received a brief period of treatment for anxiety right after her step-son had unexpectedly died in a motorcycle accident, and reported that she "remain[ed] somewhat anxious in driving situations."  (R. at 289.)  She enjoyed going out to lunch with her husband and liked to sit outside, weather permitting.  (R. at 289.)  Dr. Sloan found that Plaintiff's thought process was "logical and goal oriented," her "general fund of information appeared adequate," her immediate, long term, and working memories were intact, her short term memory was marginal, and her concentration was within normal limits but "intermittently poor."  (R. at 290.)  She was able to name three presidents, repeat phrases, calculate simple math problems orally, and could accurately recall two items of a three item list after a five minute delay. (R. at 290.)  She also was able to spell the word "world" backwards but struggled with the task.  (R. at 290.)  He diagnosed her with major depressive disorder, single episode, and cognitive disorder NOS.  (R. at 291.)  He offered a guarded prognosis but opined that Plaintiff was capable of understanding the meaning of filing for benefits and could manage her own funds.  (R. at 291.)

On August 21, 2012, Dr. Susan Posey, PsyD., completed a psychiatric review technique form for Plaintiff.  (R. at 294-307, 316-19.)  She opined that a residual functioning capacity (RFC) assessment was necessary, and that coexisting non-mental impairments existed that required referral to other medical specialties.  (R. at 294.)  She noted the existence of a cognitive disorder NOS and a mild depressive disorder, single episode.  (R. at 295, 297.)  She opined that Plaintiff had moderate

difficulties in maintaining concentration, mild limitations on activities of daily living, and no limitations on social functioning. (R. at 304.) She further opined that Plaintiff was mostly limited by physical ailments and her "alleged limits [were] not wholly supported by the evidence on record." (R. at 306.)

On August 21, 2012, Dr. Posey also completed a mental residual functional capacity assessment for Plaintiff. (R. at 316-19.) She opined that Plaintiff was not significantly limited in most all categories of understanding, memory, concentration, persistence, social interaction, and adaptation. (R. at 316-17.) There was evidence for moderate limitation on Plaintiff's ability to remember detailed instructions, her ability to carry out detailed instructions, her ability to complete a normal workday without interruptions from psychologically based symptoms, and her ability to respond appropriately to changes in the work setting. (R. at 316-17.) She overall opined that Plaintiff was "maximally able to understand, remember, and carry out detailed but not complex instructions, make decisions, and attend and concentrate for extended periods." (R. at 318.)

On August 21, 2012, Dr. Roberta Herman, M.D., completed a physical residual functional capacity assessment for Plaintiff. (R. at 308-15.) Her diagnoses were rheumatoid arthritis, mild degenerative changes in the cervical spine, fibromyalgia, degenerative changes in the right (dominant) acromioclavicular joint, and Sjogren's syndrome. (R. at 308.) Dr. Herman opined that Plaintiff could accomplish the following: lift, carry, push, or pull twenty pounds occasionally and ten pounds frequently; sit, stand, or walk (with normal breaks) for about six hours in an eight-hour workday; unlimited pushing or pulling; could not climb ladders, ropes, or scaffolds; could occasionally kneel, crouch, crawl, and climb ramps or stairs; could frequently balance and stoop; could occasionally reach in all directions with her right (dominant) shoulder; no visual limitations;

7

no communicative limitations; and no environmental limitations. (R. at 309-12.) She further opined that Plaintiff's self-reported limits were not wholly supported by the evidence on record. (R. at 313.)

On September 3, 2013, Plaintiff met with psychiatrist Dr. Roger S. Blair, M.D., for an evaluation of her reported memory loss. (R. at 407-10.) He noted that Plaintiff reported trouble concentrating, making decisions, and "absorbing information." (R. at 408.) He additionally noted that she showed signs of a normal mental status and was alert and well-oriented to time, place, and person. (R. at 409.) Dr. Blair had diagnostic impressions of "memory complaints, anxiety, [and] possible sleep apnea," and he opined that her symptoms were caused by anxiety. (R. at 410.) He recommended an MRI and additional neuropsychological testing. (R. at 410.)

On September 9, 2013, Plaintiff received neuropsychological testing from Dr. James Cannici, Ph. D., to determine her current mental functioning and memory. (R. at 321-25.) Her intelligence test results showed that she was in the "low average" range for verbal and nonverbal reasoning ability and that she was in the "borderline" range of intellectual functioning and working memory. (R. at 322-23.) Dr. Cannici noted that she performed normally on measures of simple attention but was impaired on measures of complex attention. (R. at 323.) He opined that Plaintiff had deficits in mental speed, efficiency, attention, and concentration, but "these results [were] primarily related to emotional factors." (R. at 325.) Dr. Cannici further opined that Plaintiff's "scores were suggestive of fluctuating effort" because she "endorsed items that present[ed] an unfavorable impression." (R. at 322, 323.) This meant that the testing results "may underestimate her current level of cognitive functioning" and there was the "possibility of a mild exaggeration of complaints and problems." (R. at 322, 323.) He noted that this was indicative of a "cry for help" and "could overrepresent the extent and degree of significant test findings." (R. at 324.) He recommended psychological

treatment for her depressive complaints.  (R. at 325.)

On September 17, 2013, Plaintiff had a follow-up with Dr. Blair to review the neuropsychological testing and MRI results.  (R. at 411-13.)  He first opined that everything in her MRI brain report "looked normal."  (R. at 413.)  After reviewing Dr. Cannici's evaluation, he noted that the testing suggested a "cry for help or of a markedly negative evaluation of herself and life" and opined that her "memory problems are due to anxiety."  (R. at 413.)  He recommended that Plaintiff receive counseling for her anxiety issues.  (R. at 413.)

On February 4, 2013, May 30, 2013, August 15, 2013, and January 6, 2014, Plaintiff met with Dr. Billue for various health problems, including a sore throat, sinus congestion, joint pain, and her hypothyroidism.  (R. 379-95.)  Dr. Billue noted "recent memory intact; remote memory intact" during every one of Plaintiff's physical exams at these check-ups, and found her judgment, attention span, and concentration were all "normal."  (R. at 385, 388, 392, 394-95.)

### 3.    Hearing Testimony

On March 12, 2014, Plaintiff and a vocational expert (VE) testified at a hearing before the ALJ. (R. at 33-65.)  Plaintiff was represented by an attorney. (R. at 31.)

#### a.    *Plaintiff's Testimony*

Plaintiff testified that she earned her GED and completed one year of college courses in computer science before leaving the school.  (R. at 36.)  She last worked in July 2009, and her husband had supported her since then.  (R. at 37.)  Her most recent job was a full time receptionist at Hard Band Industries from September 2008 to July 2009.  (R. at 37-38.)  She was fired from this position because she had to take significant time off when her step-son was in a coma for six weeks after being in a motorcycle accident.  (R. at 39.)  She previously worked as a full time Radio Shack

call center representative from November 1997 to May 2006.  (R. at 40-41.)  When questioned if she could return to her position at Radio Shack, she testified that there was "no way" that she could physically sit at a computer or talk on the phone all day.  (R. at 42-43.)  When asked if she could return to her receptionist position, she testified that she could not because she "just can't be around people" and her "memory seems like it's so bad."  (R. at 43.)

Plaintiff further testified that she received carpal tunnel surgery on both hands in 2006, but she still had "extreme pain" in her wrists, palms, and knuckles.  (R. at  44.)  She explained that she had difficulty using her hands for some daily activities, such as opening a jar, but she was able to do most things if she adjusted her grip, especially when using a writing utensil.  (R. at 45.)  She could not use a computer because she could not concentrate and had "severe spasms" in her neck when she tried to sit and work at a computer.  (R. at 46.)  She further testified that she had pain in her upper arms, forearms, shoulders, feet, and legs, particularly in the morning.  (R. at 47-48.)

Regarding her mental impairments, Plaintiff testified that she had suffered concentration and memory problems since 2009.  (R. at 49.)  She had to write everything down, including doctor appointments and prescription doses.  (R. at 50.)  In 2013, she met with a neurologist, Dr. Blair, who administered an MRI to determine if she had Alzheimer's disease.  (R. at 50-51.)  The MRI results were normal and there was no evidence of Alzheimer's.  (R. at 52.)  She received further testing from Dr. Blair, who was "concerned" about her "having a lot of depression" and did not "think [she] should be doing [work] at this point and stage."  (R. at 53.)  When asked about her concentration problems, she responded that she could not read a book or magazine for more than two pages at a time and did not "even care" to watch a television program for thirty minutes.  (R. at 54.)  There were several days every month that she did not want to leave bed.  (R. at 55.)  Since 2009, she

experienced stress when leaving the house to such a degree that it was "almost like hyperventilating." (R. at 55-56.) She wanted counseling for depression but was unable to afford it. (R. at 56.) She had not had other surgeries or hospital visits since July 2009. (R. at 59-60.)

### b.    VE's Testimony

The ALJ asked the VE to consider a hypothetical person who was "closely approaching past age" with a GED, a few college credits, and the same work history as Plaintiff. This hypothetical person could lift, carry, push, or pull 20 pounds occasionally and 10 pounds frequently and could sit, stand, or walk either individually or in combination throughout an eight hour work day. (R. at 60.) This hypothetical individual could perform the full range of light work with the additional limitations of not being able to climb ladders, scaffolds, or ropes and only occasionally climb ramps, stairs, kneel, crouch, or crawl. (R. at 60-61.) The individual could frequently balance or stoop, occasionally reach in all directions with the right dominant shoulder, and could perform occupations involving detailed but not complex instructions. (R. at 61.) The ALJ asked if that hypothetical individual could perform any of Plaintiff's past relevant work, and the VE said that Plaintiff's past work experience as a receptionist would "fit within the hypothetical," but the customer service call center job was "right on the border" because it was an SVP 5 job. (R. at 61-62.)

Plaintiff's attorney asked the VE if a hypothetical individual would be able to maintain competitive employment as a receptionist if he or she was off task for about 10 percent of the work day. (R. at 63.) The VE testified that it "would be difficult, if not impossible, to maintain" a receptionist job or any SVP 2 job. (R. at 63-64.)

C.   **ALJ's Findings**

The ALJ issued his decision denying benefits on July 22, 2014. (R. at 10.) At step one,[4] he determined that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of July 1, 2009, and she continued to meet the disability insured status requirements through December 31, 2013.  (R. at 14.)  At step two, he found that the medical evidence established that Plaintiff had a severe combination of the following impairments: obesity, hypothyroidism, hyperlipidemia, fibromyalgia, bilateral nuclear cataracts, degenerative changes in the cervical spine, rheumatoid arthritis, Sjogren's syndrome, fatty infiltration of the liver, degenerative changes in the right acromioclavicular joint, calcaneal bone spurs in the bilateral feet, cognitive disorder, major depressive disorder, anxiety state, post bilateral carpal tunnel releases, and left trigger thumb release. (R. at 14.)  At step three, the ALJ concluded that Plaintiff's severe impairments or combination of impairments did not meet or equal the requirements for presumptive disability under the listed impairments in 20 C.F.R. Part 404. (R. at 14-15.)

Next, the ALJ determined that Plaintiff's allegations regarding her level of pain and subjective complaints had minimal credibility and were not reasonably supported by the findings of the objective medical evidence and inferences therefrom.  (R. at 21.)  The ALJ determined that Plaintiff retained the RFC to perform less than the full range of light work with the following limitations: she could lift, carry, push, or pull twenty pounds occasionally and ten pounds frequently; sit, stand, or walk (individually or in combination) throughout an eight-hour workday; could not climb ladders, ropes, or scaffolds; could occasionally kneel, crouch, crawl, and climb ramps or stairs; could frequently balance and stoop; could occasionally reach in all directions with her right

---

[4] The five-step analysis used to determine whether a claimant is disabled under the Social Security Act is described more specifically below.

(dominant) shoulder; and was limited to occupations involving detailed, but not complex, instructions.  (R. at 24.)

At step four, the ALJ determined that Plaintiff could return to her past relevant work experience as a receptionist, as she performed it and as it is customarily performed in the national economy.  (R. at 25.)  He relied upon the VE's testimony to find that Plaintiff's impairments did not prevent her from performing her past relevant work as a receptionist.  (R. at 25.)  Because the ALJ found that Plaintiff could return to her past relevant work, he did not reach step five.  Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined by the Social Security Act, from her alleged onset of disability date of July 1, 2009, through the date of last insured of December 31, 2013.  (R. at 25.)

## II. ANALYSIS

### A.    Legal Standards

#### 1.    Standard of Review

Judicial review of the commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence.  *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. §§ 405(g), 1383(c)(3).  Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995).  In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence supports the Commissioner's decision. *Greenspan*,

38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id.* The Court may rely on decisions in both areas, without distinction, when reviewing an ALJ's decision. *Id.*

### 2. Disability Determination

To be entitled to social security benefits, a claimant must prove he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 189, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1.  An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.  An individual who does not have a "severe impairment" will not be found to be disabled.

14

3.      An individual who "meets or equals a listed impairment in Appendix 1" will not be found to be disabled.

4.      If an individual is capable of performing the work he had done in the past, a finding of "not disabled" must be made.

5.      If an individual's impairment precludes him from performing his work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (per curiam) (summarizing 20 C.F.R. § 404.1520(b)-(f)) (currently 20 C.F.R. § 404.1520(a)(4)(i)-(v)).  Under the first four steps of the analysis, the burden lies with the claimant to prove disability.  *Leggett*, 67 F.3d at 564.  The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled.  *Id*.  Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show there is other gainful employment available in the national economy that the claimant is capable of performing.  *Greenspan*, 38 F.3d at 236.  This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations, by vocational expert testimony, or other similar evidence.  *Froga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).  A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis.  *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

**B.**    <u>**Issues for Review**</u>

Plaintiff presents three issues for review:

I.      The ALJ failed to evaluate the opinion evidence in this case consistent with the regulations, Agency policy, and the Fifth Circuit's holding in *Newton v. Apfel*.

A.      Treating and examining Source Opinions

          B.      The ALJ failed to provide "good cause" for rejecting Dr. Billue's opinion, and failed to provide analysis with respect to the opinions of Drs. Blair and Cannici at all.

II.      The ALJ erred by failing to take into consideration Plaintiff's excellent work history.

III.     The ALJ's errors are not harmless.

(doc. 13 at 4.)

## C.    <u>Medical Opinion Evidence</u>

Plaintiff contends that the ALJ erred by failing to provide "good cause" for rejecting Dr. Billue's treating source opinion and by failing to analyze the opinions of Drs. Blair and Cannici. (doc. 13 at 13-18.)

### *1.*    *Dr. Billue*

Plaintiff argues that the ALJ failed to evaluate Dr. Billue's treating source opinion on her mental impairments under the factors set forth in 20 C.F.R. § 404.1527(c). (*Id*. at 14-15.)

The Commissioner is entrusted to make determinations regarding disability, including weighing inconsistent evidence. 20 C.F.R. § 404.1529(b). Every medical opinion is evaluated regardless of its source, but the Commissioner generally gives greater weight to opinions from a treating source. *Id*. at § 404.1527(c)(2). A treating source is a claimant's "physician, psychologist, or other acceptable medical source" who provides or has provided a claimant with medical treatment or evaluation, and who has or has had an ongoing treatment relationship with the claimant. *Id*. at § 404.1502. When "a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence," the Commissioner must give such an opinion controlling weight. *Id*. at § 404.1527(c)(2). If controlling weight is not

given to a treating source's opinion, the Commissioner considers six factors in deciding the weight given to each medical opinion: (1) whether the source examined the claimant or not; (2) whether the source treated the claimant; (3) the medical signs and laboratory findings that support the given opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is made by a specialist or non-specialist; and (6) any other factor which "tend[s] to support or contradict the opinion." *See id.* at § 404.1527(c)(1)–(6).

While an ALJ should afford considerable weight to opinions and diagnoses of treating physicians when determining disability, sole responsibility for this determination rests with the ALJ. *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000). If evidence supports a contrary conclusion, an opinion of any physician may be rejected. *Id.* A treating physician's opinion may also be given little or no weight when good cause exists, such as "where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence." *Id.* at 455–56. Nevertheless, "absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician only if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in [then] 20 C.F.R. § 404.1527(d)(2)." *Id.* at 453. A detailed analysis is unnecessary, however, when "there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another" or when the ALJ has weighed "the treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion." *Id.* at 458.

Here, Dr. Billue was Plaintiff's "family doctor" and had treated her since at least 2006. (R.

17

at 229-87, 379-406.)  She provided a check-box questionnaire in which she considered Plaintiff's

mental impairments and diagnosed her with depression and a poor prognosis. (R. at 282.) Dr. Billue

opined in the questionnaire that Plaintiff had no useful ability to function in thirteen of twenty-five

areas for "mental abilities needed to do any job." (R. at 282-84.) She determined that Plaintiff had

little to no mental aptitude to carry out very short and simple instructions, to maintain attention for

a two hour segment, and to understand and remember detailed instructions.  (R. at 282-83.)  During

subsequent physical exams, Dr. Billue did not note these impairments about Plaintiff's memory in

her treatment records, but instead noted, "recent memory intact; remote memory intact," and with

judgment, attention span, and concentration all being "normal."  (R. at 385, 388, 392, 394-95.)

The ALJ's decision noted that a treating physician's opinion is ordinarily afforded great or

controlling weight but may be rejected if there is good reason to do so.  (R. at 24.)   It determined

that Dr. Billue's medical opinion should be afforded  no weight whatsoever because her "treatment

records . . . were devoid of any significant positive clinical findings to support her assessment of

[Plaintiff's] mental functioning." (R. at 24.) It also explained that Dr. Billue "offered no explanation

whatsoever for the significant discrepancy between [her opinions on the questionnaire] and her

treatment records," and that her opinions "were not supported by the remaining credible and

objective evidence."  (R. at 24.)

The ALJ also discussed and examined the medical opinions of the three other examining

physicians who opined on Plaintiff's mental impairments, *i.e.* Drs. Sloan, Blair, and Cannici.  (R.

at 18-20.)  He first noted that Dr. Sloan opined that Plaintiff's immediate, working, and long-term

memories were intact, but her short-term memory was marginal, and that her concentration was

within normal limits but "intermittently poor."  (R. at 18-19.)   He next noted that Dr. Blair's

"diagnostic impressions" were memory complaints and anxiety, but her neurological examination was "essentially unremarkable."  (R. at 19.)  He also noted that Dr. Cannici opined that Plaintiff performed normally on measures of simple attention but was impaired on measures of complex attention and mental speed; Plaintiff's test results suggested a "fluctuating effort" and mild exaggeration of her complaints during the testing which could have "over-represent[ed] the extent and degree of significant test findings," however. (R. at 20.) The ALJ further explained that Plaintiff received repeated normal mental status examinations with Dr. Billue, which was inconsistent with her opinions in her questionnaire.  (R. at 23.)  Overall, the ALJ's decision reflected that Dr. Billue was the only physician who opined that Plaintiff had "significant deficits" in concentration, persistence or pace. (R. at 285-86.)

Because the ALJ relied on competing first-hand medical evidence in this case, including Dr. Billue's own treatment notes, and he found the opinions of the other examining physicians more well-founded, he was not required to perform a full factor-by-factor analysis when rejecting his opinion.  *See Newton*, 209 F.3d at 458.  The ALJ's decision to reject Dr. Billue's treating source opinion on Plaintiff's mental impairments does not amount to reversible error.  *See id.*  To the extent that Plaintiff complains of the failure to include medical opinions from Dr. Billue on the mental limitations in Plaintiff's RFC, the ALJ did not err, and remand is not required on this issue.[5]

---

[5]  Plaintiff also argued here that the ALJ had a duty to re-contact Dr. Billue for additional information pursuant to *Newton*, "given that her opinion is un-contradicted by any treating or examining source."  (doc. 13 at 17.) As discussed, the ALJ did assess Dr. Billue's medical opinion questionnaire and found that "her opinions were not supported by the remaining credible and objective evidence," including the other examining physician's medical opinions on Plaintiff's mental impairments.  (R. at 24.)  Because he relied upon other medical opinion evidence from examining physicians in the determined RFC, the ALJ did not err by failing to seek additional information from Dr. Billue and remand is not required.  *See Newton*, 209 F.3d at 453, 457 ("if the Commissioner determines that a treating physician's records are inconclusive or are otherwise inadequate to receive controlling weight, absent other medical opinion evidence by an examining or treating physician, the ALJ must seek clarification or additional evidence from the treating physician in accordance with 20 C.F.R. § 404.1512(e)").

### 2.    *Drs. Blair and Cannici*

Plaintiff next argues that the ALJ erred by failing to analyze or assign weight to the medical opinions of Drs. Blair and Cannici when determining her RFC.  (doc. 13 at 15-17.)

Residual functional capacity, or RFC, is defined as the most that a person can still do despite recognized limitations.  20 C.F.R. § 404.1545(a)(1).  It "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis."  SSR 96-8p, 1996 WL 374184 at *1 (S.S.A. July 2, 1996).  An individual's RFC should be based on all of the relevant evidence in the case record, including opinions submitted by treating physicians or other acceptable medical sources.  20 C.F.R. § 404.1545(a)(3); SSR 96-8p, 1996 WL 374184 at *1.

The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity."  *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir.1985).  The ALJ may find that a claimant has no limitation or restriction as to a functional capacity when there is no allegation of a physical or mental limitation or restriction regarding that capacity, and no information in the record indicates that such a limitation or restriction exists.  *See* SSR 96–8p, 1996 WL 374184 at *1.  The ALJ's RFC decision can be supported by substantial evidence even if he does not specifically discuss all the evidence that supports his decision or all the evidence that he rejected.  *Falco v. Shalala*, 27 F.3d 160, 164 (5th Cir. 1994).  A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record.  *Leggett*, 67 F.3d at 564.  Nevertheless, the substantial evidence review is not an uncritical "rubber stamp" and requires "more than a search for evidence supporting the [Commissioner's] findings."  *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th

Cir. 1984) (citations omitted).  The Court "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the" ALJ's decision.  *Id.*  Courts may not reweigh the evidence or substitute their judgment for that of the Commissioner, however, and a "no substantial evidence" finding is appropriate only if there is a "conspicuous absence of credible choices" or "no contrary medical evidence[.]"  *See Johnson*, 864 F.2d at 343 (citations omitted).

The Commissioner is entrusted to make determinations regarding disability, including weighing inconsistent evidence.  20 C.F.R. §§ 404.1520b(b) and 404.1527(c).  Every medical opinion is evaluated regardless of its source.  *Id.* at § 404.1527(c)(1).  Generally, an opinion from an examining source is given more weight than the opinion from a non-examining source.  *Id.* However, the "standard of deference to the examining physician is contingent upon the physician's ordinarily greater familiarity with the claimant's injuries.  [W]here the examining physician is not the claimant's treating physician and where the physician examined the claimant only once, the level of deference afforded his opinion may fall correspondingly."  *Rodriguez v. Shalala*, 35 F.3d 560 (5th Cir. 1994) (unpublished) (citing *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990)).  The ALJ is also free to reject the medical opinion of any physician when the evidence supports a contrary conclusion.  *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1981).  Moreover, "[w]hen a treating or examining physician's opinions are inconsistent with other substantial evidence in the record, the opinions are not entitled to any specific weight in the ALJ's decision."  *Smith v. Comm'r of Soc. Security Admin*, No. 4:12-CV-00625-DDB, 2014 WL 4467880 at*3 (E.D. Tex. Sept. 9, 2014).

When Dr. Blair first met with Plaintiff, he noted her memory complaints, anxiety, and potential sleep apnea before referring her for an MRI brain scan and neuropsychological testing with

21

Dr. Cannici.  (R. at 407-10.)  Dr. Cannici administered several tests to Plaintiff and noted that her results showed she was in the "low average" range for verbal and nonverbal reasoning ability, and that she was in the "borderline" range of intellectual functioning and working memory.  (R. at 322-23.)  Dr. Cannici opined that she performed normally on measures of simple attention, learning, and memory; however, she was impaired on measures of complex attention, mental speed, and concentration.  (R. at 323-25.)  He also noted multiple times that she may have "put forth insufficient effort" during the testing because her results were "suggestive of fluctuating effort," which could underestimate the test findings on her true cognitive abilities.  (R. at 322-25.)  Plaintiff met again with Dr. Blair for a follow-up to discuss her MRI and test results.  (R. at 411-13.)  Dr. Blair first noted that "everything looked normal" on her MRI brain report.  (R. at 413.)  He then noted Plaintiff's fluctuating efforts during the neuropsychological testing and opined that the tests "showed that she can't perform well," and that her memory problems are due to anxiety. (R. at 413.) He did not further opine on Plaintiff's mental impairment limitations, instead quoting Dr. Cannici's summary of the testing.  (R. at 413.)

The ALJ's findings included detailed descriptions of both Drs. Blair's and Cannici's medical records and opinions.  (R. at 19-20.)  He noted that both doctors reviewed tests administered by Dr. Cannici and found evidence of mental impairments that appeared to be caused by stress or anxiety. (R. at 20.)  The ALJ also noted Dr. Cannici's opinion that Plaintiff appeared to mildly exaggerate her performance on the testing, which was "indicative of a cry for help or a markedly negative evaluation of herself" and could over-represent the extent and degree of significant test findings. (R. at 20.)  The ALJ analyzed these test results and found that great weight should not be afforded to them because they "admittedly were likely an underestimate of [Plaintiff's] true cognitive

abilities." (R. at 23.)  The ALJ ultimately found that her "mental impairments resulted in moderate deficiencies of concentration, persistence, or pace, but only insofar as she was limited to occupations involving detailed, but not complex, instructions," and that "she was limited to occupations involving detailed, but not complex, instructions."  (R. at 14, 23, 24.)

Plaintiff argues that the ALJ should have analyzed the opinions of Drs. Blair and Cannici pursuant to 20 C.F.R. § 404.1527(c).  (doc. 13 at 15.)  The ALJ, however, did discuss both medical opinions and specifically determined that the testing, upon which both doctors based their diagnoses, should not be "afford[ed] great weight." (R. at 23.)  By specifically indicating and explaining which portions of the medical evidence from Drs. Blair and Cannici he discredited, the ALJ did assign weight to their opinions.  *See King v. Comm'r of Soc. Sec. Admin.*, No. 12-752-SDD, 2014 WL 905207 at *4 (M.D. La. Mar. 7, 2014) (finding that "the ALJ did assign weight to the opinion by specifically indicating which portions he discredited and why").  The ALJ, moreover, was not required to analyze the opinions of Drs. Blair and Cannici under the § 404.1527 factors because there was "competing first-hand medical evidence" from examining source Dr. Sloan, who opined that her immediate, working, and long-term memories were intact, and that her concentration was within normal limits though it was "intermittently poor" (R. at 290-91).  *See Walker v. Barnhart*, 158 F. App'x 534, 535 (5th Cir. 2005) (quoting *Newton*, 209 F.3d at 458).  Further, because the opinions of Drs. Blair and Cannici conflicted with other medical evidence, their opinions were not entitled to any specific weight in the ALJ's decision.  *See Escalante v. Colvin*, No. 3:14-CV-0641-G-BH, 2015 WL 1443000 at *9 (N.D. Tex. Mar. 31, 2015). Regardless, the ALJ's RFC decision can be supported by substantial evidence even if he did not specifically discuss all the evidence that supported his decision or all the evidence that he rejected. *See Falco*, 27 F.3d at 164.

To the extent that Plaintiff complains of the failure to assign weight to the opinions of Drs. Blair and

Cannici, the ALJ did not err, and remand is not required on this basis.

### 3.     Nonexamining Consultant

Plaintiff argues that the ALJ additionally erred by assigning dispositive weight and

"deferring" to a nonexamining consultant's opinions on Plaintiff's mental impairments.  (docs. 13

at 16-17, 15 at 2.)

Though neither Plaintiff nor the ALJ identify her by name, the only nonexamining consultant

for Plaintiff's mental impairments was Dr. Posey, who completed both a psychiatric review

technique form and a mental residual functional capacity assessment for Plaintiff.  (R. at 294-307,

316-19.)   In the psychiatric review technique form, she opined that Plaintiff had moderate

difficulties in maintaining concentration, mild limitations on activities of daily living, and no

limitations on social functioning. (R. at 295-97, 304.) In the mental residual functional capacity

assessment, Dr. Posey opined that Plaintiff was not significantly limited in most all categories of

understanding, memory, concentration, persistence, social interaction, and adaptation; however there

was evidence for moderate limitation in Plaintiff's ability to remember detailed instructions, her

ability to carry out detailed instructions, and her ability to complete a normal workday without

interruptions from psychologically based symptoms.  (R. at 316-17.)

Plaintiff argues that the ALJ rejected every treating and examining source opinion and

instead based his denial on Dr. Posey's opinion.  (doc. 13 at 16.)   The ALJ, however, never

discussed or analyzed Dr. Posey's opinions besides stating at the outset that he "concurred with the

State agency medical consultants as to their mental and physical residual functional capacities, but

[he] found [Plaintiff's] mental and physical residual functional capacities existed for the entire

period at issue." (R. at 15.)  He, moreover, never mentions deferring or assigning dispositive weight

to any nonexamining consultant for Plaintiff's mental restrictions. His only mention of deferring to

a nonexamining consultant was during his analysis of Plaintiff's physical restraints where he stated:

> I deferred to the opinions of the State agency medical consultants, and I afforded the
> claimant the benefit of every doubt and the most liberal interpretation of her
> symptoms, in finding she could lift, carry, push, and pull only twenty pounds
> occasionally and only ten pounds frequently.  (R. at 23.)

Plaintiff claims that the ALJ "mirrored" his RFC and credibility findings from Dr. Posey's opinion.

(doc. 13 at 16.)  Though the ALJ found that Plaintiff had an RFC similar to Dr. Posey's opinion that

she was "maximally able to understand, remember, and carry out detailed but not complex

instructions"  (R. at 318), both findings are based upon Dr. Sloan's medical opinions as an

examining physician (R. at 23).  The ALJ's findings that Plaintiff was limited to occupations

involving detailed, but not complex, instructions are consistent with Dr. Sloan's opinion that

Plaintiff had a logical thought process with "concentration . . . within the normal limits" intact

immediate, working, and long term memory but suffered from a marginal short term memory and

"intermittently poor concentration." (R. at 290-91.)  The ALJ took care to explain the bases for the

RFC determination with references to the record medical evidence that supports Plaintiff's assigned

RFC.  (R. at 17-25.)  Based upon his findings, the ALJ did not defer to a nonexamining consultant

and properly based the Plaintiff's RFC on substantial evidence in the record.  The ALJ did not err,

and remand is not warranted on this basis.

**D.**     **Credibility Assessment**

Plaintiff argues that the ALJ erred by failing to consider her strong work history as a part of

his credibility analysis.  (doc. 13 at 18-19.)

When the ALJ issued his decision, Social Security Ruling: SSR 96–7p[6] required him to follow a two-step process for evaluating a claimant's subjective complaints. SSR 96–7p, 1996 WL 374186, at *2 (S.S.A. July 2, 1996). First, the ALJ must consider whether the claimant had a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. *Id*. Once such an impairment is shown, the ALJ must evaluate the intensity, persistence, and limiting effects of the alleged symptoms to determine the extent to which they limit the individual's ability to do basic work activities. *Id.* If the claimant's statements concerning the intensity, persistence, or limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the ALJ must make a credibility finding regarding the claimant's statements. *Id.*; *Falco*, 27 F.3d at 164 (citing *Scharlow v. Schweiker*, 655 F.2d 645, 648-49 (5th Cir. 1985)).

The ALJ's credibility determination must be based on a consideration of the entire record, including medical signs and laboratory findings, and statements by the claimant and her treating or examining sources concerning the alleged symptoms and their effect. SSR 96–7p, 1996 WL 374186 at *2. The ALJ must also consider a non-exclusive list of seven relevant factors in assessing the credibility of a claimant's statements:

1. the claimant's daily activities;

2. the location, duration, frequency, and intensity of pain or other symptoms;

---

[6] Effective March 16, 2016, the Social Security Administration eliminated "use of the term 'credibility' from [its] sub-regulatory policy," clarifying "that subjective symptom evaluation is not an examination of an individual's character." SSR 16-3p, 2016 WL 1020935 at *1 (S.S.A. Mar. 16, 2016). When the ALJ issued his decision here, SSR 96-7p was the relevant social security ruling and specifically used the term "credibility." SSR 96-7P, 1996 WL 374186 at *7 (S.S.A. July 2, 1996). His credibility finding is properly analyzed under SSR 96-7p. *See Mayberry v. Colvin*, No. CV G-15-330, 2016 WL 7686850 at *5 (S.D. Tex. Nov. 28, 2016), adopted, 2017 WL 86880 (S.D. Tex. Jan. 10, 2017) (noting that "[b]ecause the text of SSR 16–3p does not indicate the SSA's intent to apply it retroactively, the Court would be disinclined to do so"). Even if SSR 16-3p applied retroactively, however, the recommendation concerning this issue would not differ.

3. factors that precipitate and aggravate symptoms;
4. the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms;
5. treatment, other than medication, for relief of pain or other symptoms;
6. measures other than treatment the claimant uses to relieve pain or other symptoms (*e.g.*, lying flat on his or her back);
7. and any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. *Id.* at *3.

Although the ALJ must give specific reasons for his credibility determination, "neither the regulation nor interpretive case law requires that an ALJ name, enumerate, and discuss each factor in outline or other rigid, mechanical form.  It suffices when the administrative decision is sufficiently specific to make clear that the regulatory factors were considered." *Prince v. Barnhart*, 418 F. Supp. 2d 863, 871 (E.D. Tex. 2005).  Moreover, the Fifth Circuit has explicitly rejected the requirement that an ALJ "follow formalistic rules" when assessing a claimant's subjective complaints. *Falco*, 27 F.3d at 164. The ALJ's evaluation of the credibility of subjective complaints is entitled to judicial deference.  *See Carrier v. Sullivan*, 944 F.2d 243, 247 (5th Cir. 1991). The ALJ is in the best position to assess a claimant's credibility, since she "enjoys the benefit of perceiving first-hand the claimant at the hearing." *Falco*, 27 F.3d at 164 n.18.

Here, the ALJ noted that he evaluated Plaintiff's subjective complaints in compliance with SSR 96-7p and "considered [Plaintiff's] good work history through 2009 and the information and observations provided by her treating and non-treating physicians and the consultative physician, as well as by third parties."  (R. at 21.)  He found that Plaintiff's "impairments may have resulted in some level of pain and functional loss" but "neither the objective medical evidence, [Plaintiff's] allegations, nor any other credible evidence establishes [that she] was so limited as to be found disabled." (R. at 22.) He detailed inconsistencies between Plaintiff's subjective complaints and her "normal" examination results with Drs. Cannici, Blair, and Bajaj.  (R. at 22.)  He further discussed

27

several of the enumerated factors, including her daily activities, intensity of the alleged pain, symptoms, medication, and treatment.  (R. at 21-23.)  The ALJ found that the "credibility of [Plaintiff's] allegations was limited" because her "subjective complaints were grossly out of proportion to the objective findings on the diagnostic studies and on physical examinations."  (R. at 22.)

Plaintiff points to evidence that she "accrued covered earnings for 131 of the 137 quarters prior to her alleged disability onset, or 32 3/4 of 34 1/4 years" (doc. 13 at 18) and cites to the Second Circuit Court of Appeals for the proposition that a "claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of a disability." *Rivera v. Schweiker*, 717 F.2d 719, 725 (2d Cir. 1983) (citing *Singletary v. Sec'y of Health, Educ. and Welfare*, 623 F.2d 217, 219 (2d Cir. 1980)).  The ALJ's decision does state that he "considered [Plaintiff's] good work history through 2009" during his credibility analysis pursuant to SSR 96-7p. (R. at 21, 126-27.)  Though the ALJ did not specifically identify the number of quarters or years that she accrued covered earnings, his analysis shows that he considered this work history but relied primarily on the medical evidence of record to find Plaintiff not credible. Although not in a formalistic fashion, he considered the factors for determining credibility and adequately explained his reasons for rejecting Plaintiff's subjective complaints, and there is substantial evidence to support his determination. *See Falco*, 27 F.3d at 164.  Because Plaintiff has not shown that the ALJ erred by failing to take Plaintiff's work history into consideration when making an adverse credibility determination, remand is not required on this issue.

### III. RECOMMENDATION

The Commissioner's decision should be **AFFIRMED**.

**SO RECOMMENDED** on this 7th day of February, 2017.


IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE


## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law.  Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.  Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error.  *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).


IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE


29